## Evans v. Foss & a.

When the court instructed the jury, that upon a contract of sale the title to a
pair of oxen having passed to the defendant, there was an implied license
to enter the plaintiff's barn and take them; and at the same time, they
were told, that these instructions were given with some hesitation, as de-
fendant, knew that there was a misunderstanding as to the sale, but that
they might take the law to be as stated;—it was *held*, that the defendant
had no cause to complain.

A contract was made for the exchange of plaintiff's oxen for the defendant
Foss' steers and $125 in money; but the parties disagreed, as to whether it
was for defendant's yearling, or two years old steers. Defendant's servants
drove the yearling steers to plaintiff's barn and took away the plaintiff's
oxen, against plaintiff's remonstrance, defendant Foss knowing that plain-
tiff claimed the two years old steers. The court instructed the jury, that if
they found the acts of the defendants to be wanton, they might award vin-
dictive damages;—*held*, that in this, there was no error, there being evi-
dence, on which the jury might have found, that defendants acted in bad
faith and maliciously.

When the verdict of the jury is ambiguous, the court may, in its discretion,
send out the jury for further deliberation, even after they had sealed up
their verdict, and separated for dinner, there being no suggestion of abuse,
during such separation.

Where the officer in charge of a jury, without the direction of the court or
the consent of the parties, allowed the jury to separate after having agreed
upon, and sealed up their verdict, to be rendered in court on its opening in
the afternoon, the verdict will not be disturbed for that cause, when it ap-
pears there was no intentional wrong on the part of the officer or the jury,
unless there is cause to suspect, that some abuse was practiced.

THIS was trespass *quare clausum fregit*, by George S. Evans against
Aaron W. Foss, John W. Bateman & Albert Foss, wherein plaintiff
alleged in his writ, that the defendants, on the 11th of November,
A. D. 1868, with force, &c., broke and entered a certain close and
barn of plaintiff, situate in Strafford, in this county, and then and
there with force as aforesaid, took and carried away a certain yoke
of oxen, five years old, the property of plaintiff, and of the value of
three hundred dollars, and kept and detained said oxen, and still
keeps and detains the same against the peace, &c. The defendants'
plea was the general issue with a brief statement as follows: The
plaintiff will take notice, that upon the trial of the above issue, that
at the time mentioned in said declaration, said oxen were the property
of said Aaron W. Foss, and that said Aaron was then and there
entitled to the possession and custody of the same, and that said oxen
being then and there in said barn, and wrongfully kept there by said
plaintiff, the said Aaron W. Foss ordered and commanded said John
W. Bateman and Albert Foss, his servants and agents to enter upon

said close, and take away said oxen for him, the said Aaron; where-upon said Bateman and Albert, by said order and command of said Aaron as his servants and agents, entered upon said close and into said barn, and took away said oxen and delivered them to said Aaron, as he had a right to do, for the cause aforesaid, doing no unnecessary damage, &c. Under this issue, the evidence tended to show that the defendant, A. W. Foss, on the 9th day of November, 1868, called at plaintiff's house in Strafford, in company with one Edward Piper, and proposed to exchange, as he said, a pair of white-faced, two years old steers, owned by him, for a pair of oxen about five years old, owned by the plaintiff, and that he would pay as boot money $125, plaintiff demanding $130. Plaintiff's statement was that the defendants' steers which he then offered in exchange for the oxen were a pair of brown yearlings, and not two years old. The plain-tiff's oxen were then present and examined by the defendant, but the steers were in the defendant's pasture at some distance from the parties. No trade was completed that day. The next day the de-fendant again went to the plaintiff's barn and renewed the trade. The parties were alone. The parties professed to close the trade, but it appeared that the parties did not understand the trade alike. The defendant said, that he was to have the oxen for the yearling brown steers and to pay $125, and that the trade was concluded accord-ingly,—he paying down the money at the time, the plaintiff saying he was to have the white-faced two years old steers and the $125 for the oxen. The parties before they separated, appointed as the time the afternoon of that day, and Caswell's pair of bars, about two miles distant from plaintiff's residence, as the place for the exchange of the animals. The plaintiff took his oxen to the place agreed upon, at the appointed time. The defendant sent his pair of brown yearlings by his two sons. When the plaintiff met the boys, he declined to take the yearling steers and deliver up his oxen, offering as the reason that they were not the steers he traded for, and insisted he was to have the white-faced steers. The plaintiff told the boys to drive back the steers, and offered the money also to the elder boy. But he declined to take the money, saying he knew nothing about the trade. Plaintiff told the boys he would see their father the next day. On the 11th of November, in the morning, the defendant ordered his son and servant Bateman to take the brown yearling steers up to Evans, and to get the oxen, and go to plowing with them on his land. The plaintiff testified that he saw the boys com-ing with the steers. "They entered my yard; Albert stood at the bars to keep the steers in the yard; my oxen were tied up in the barn; Bateman came into the barn and said the oxen had got to go. I told him not to take them out of the barn. He unhooked the chains and drove them out. Foss and Bateman then put the steers into the barn and tied them up with the chains. I forbid them. They drove the oxen off and have kept them ever since. My price for them was $250. They were well matched and good workers." Plaintiff said that Foss at the first interview stated that he, Foss, had

measured one of the brown steers, and that his measure was five feet, and the other was nearly as large. Plaintiff said that while they were in his possession he caused them to be measured, and one measured 4 feet 9 inches, the other 4 feet 7 inches. On the 17th of November, plaintiff said that, assisted by his son Charles and Hanscomb, he drove the steers back to the defendant's field, and put them into the defendant's field. Foss was gone, but his wife was at home and forbid him; and about the same time he carried the $125 down to Foss' house, in company with Coombs, and one Avery and his son, and offered said money to Foss and demanded his oxen. Foss refused to deliver up the oxen, or to take the money. Plaintiff left the same money he had of Foss, on the table. Foss said he would not be responsible for it, and would charge him $1 per day for keeping the steers so long as they remained there. Foss said he would sell the oxen to him for $180. There was much other testimony; some of which was of a contradictory character, which more or less tended to illustrate the probabilities of the contract, &c., on either side. The jury having rendered their verdict for plaintiff, the defendants now move to set it aside. 1. Defendants except to the charge of the court to the jury. The court, among other things, told the jury that the design of this form of action was generally to determine or settle injuries to the possession of real estate, and sometimes the title of other kinds of property. Thus, in this case, if the jury should find that there was no contract in fact made by the parties, then their verdict would be for the plaintiff, because the right and title to the oxen would remain with the plaintiff without change. If the plaintiff actually bargained and sold his oxen in good faith to the defendant, the oxen being at the time on plaintiff's land, the (plaintiff?) would have an implied license to go upon plaintiff's premises and get them; and what he could do himself, might be done as well by his servants. The court further remarked that this law was given to the jury with some hesitation under the evidence in this case, as the defendant, Foss, was aware, before he sent his servants to the plaintiff's barn, that a dispute or misunderstanding existed between the parties as to the existence and nature of the contract between them, and under such circumstances the entry upon plaintiff's premises, in the manner as stated, by the testimony would tend to invite opposition and a breach of the peace. Still the court would give them the law as stated above, and if they found, under the evidence, the existence of the contract, in substance as contended for by the defendants, then the jury would be guided by it in rendering their verdict; and in such case they might find the defendants justified according to their plea. But if on the other hand, they should find that no contract had ever been understandingly made by the parties, or that the contract was in fact as contended for by the plaintiff, then their verdict might be for the plaintiff; and as to the question of damages, they might first find an adequate recompense for the breaking and entry into plaintiff's close, as described in his writ, and according to the proof, if they found the defendants' acts were

wanton, they might find vindictive damages, and they might also give to the plaintiff the full value of the oxen.

This cause was the one last tried at this term by the jury, and was committed to the jury about noon of the last day of said term. The jury were placed under the care of Henry A. Drew, as an officer, with instructions as he said, to keep the jury together until they agreed. The court having adjourned for dinner, and the jury having agreed upon their verdict in a short time, the jury, having sealed up their verdict, were permitted by the officer to separate, without consulting the court or the parties. The presiding officer of the court, Joseph Jones, and said Drew, immediately called upon the court and stated the aforesaid proceedings. The court told Drew that no order or consent had been given for the jury to separate, that he might see the counsel on either side, to find if they had any objections. Accordingly they immediately repaired to Mr. W. B. Small, one of the counsel for the defendants, and he informed the said officers, as they depose, that he had no objections to their separation. "At the time said Drew called upon said Small to obtain his consent to the separation of the jury, as said Small deposes, he then did not know, and had not been informed, and did not understand that the jury had separated without the consent of the court, but he supposed the judge had authorized the officer to discharge the jury, when they had agreed, without consulting counsel; and that he understood and supposed, in making the answer, that Drew only desired to know whether he made objections to the proceedings of the judge in that particular; and that he did not consent to the jury being thus allowed to disperse by the officers without the authority of the court; and that he never intended to waive any such objection. Also, said Small deposes that he has no recollection that said Jones ever spoke to him upon the subject of the separation of the jury, and that he is quite sure he never did. The affidavit of Mr. Small may be referred to." Drew, in justification, also said that in two other cases, where he previously had charge of juries during this term, they had been permitted to separate after sealing up their verdicts, and he supposed the same rule would be allowed in this case. At the coming in of the court in the afternoon, the foreman produced the sealed verdict. It was opened and read, with the assent of the counsel for plaintiff, and with the dissent of the counsel for defendants. Under the usual caption, expressive of the term of court, and the names of the parties to the action, the said verdict read as follows: "The jury find that the detendants are guilty in manner and form as the plaintiff has declared against them, and assess damages in the sum of fifty dollars. The jury find the value of the oxen to be two hundred dollars." Signed, "Geo. Stevens, foreman."

The court recommitted this verdict to the jury, instructing them that whatever damages they intended to find for plaintiff, they might assess in one entire sum. The jury returned in a short time another verdict, assessing the amount of damages at $250.

The defendants objected to the recommitment of the verdict "because the first verdict as returned is indefinite and uncertain, and cannot be made certain. 2. Because after the first verdict had been opened, read and declared by the clerk, the court, against the defendants' objection, ordered the jury to go out and return another verdict in some definite form in damages." The two verdicts, and the affidavits of Jones and Drew on file, may be referred to by either party, or any other matter of record used in the case.

*Hall*, for defendant.

The remarks of the court to the jury, about the evidence in connection with the statement of the law relative to defendants' right by implied license to enter the *locus in quo* and take the oxen, were highly objectionable and prejudicial to the rights of defendants. If the owner of the land, sells the goods thereof to the defendants, a license to enter and take them is implied in the contract. Greenl. on Ev. vol. 2, § 627; *Wood* v. *Manley*, 11 Ad. & El. 34; *Nettleton* v. *Sikes*, 8 Met. 34. This rule of law, is held absolutely and it could make no difference to the defendants' right to enter and take his property, how much opposition plaintiff might make, or how flagrant a breach of the peace he might be guilty of, consequent upon defendants exercising this right. The court did not properly state this principle of law to the jury, because it was accompanied by a remark in terms saying, that the court had grave doubts of its application to this case. It is true, that the court did finally tell the jury, that if they found there was a sale from plaintiff to defendants, then they would justify defendants on the ground of implied license; still, this was after, and in close connection with the remarks, "that this law was given to the jury with some hesitation under the evidence in this case." The impression, which the jury received from the use of such language in the connection in which the case finds it was used, must have been that the court felt, that the defendants failed on the facts proven, to bring their case within the rule of law laid down, and that they were in fact guilty of a trespass. There was a plain invasion by the court, of the special province of the jury, to weigh the evidence.

This is no case for directing the jury to find vindictive damages. Such damages, on the authorities, are said to be in the nature of punishment for crime, here defendants were simply acting in good faith, under what they understood to be the contract for an exchange of cattle.

This case presents the anomoly of two separate and distinct verdicts found at one trial. No claim is made, that *both* can stand. We submit, that neither should, because the jury separated before rendering their first verdict, in violation and defiance of the unvarying rule and practice of our courts from time immemorial. Juries are never allowed to seal up their verdicts, and separate before returning them into court, without express authority from the court so

to do, the court before the jury are sent out, obtaining the assent of counsel engaged in the cause, that such a course may be pursued. In this case, there is no pretence of any such authority before the separation of the jury, and it is equally clear from the affidavit of Mr. Small, that he in no way assented to the separation. Litigants have the right to insist that jurors, shall in finding and returning verdicts act conformably to the rules of practice of the court, just as much as that the verdict shall be found on consideration of admissible testimony only. If the rule and practice of the courts may be disregarded, as was done in this case, to what extent may not the jury disregard the instructions of the court, and what guaranty have suitors in court, that any and all of their rights may not be trifled with, without remedy.

The first verdict was not only defective in form, but it was entirely uncertain what its meaning was. As to the second verdict, specially, we say, that it can have no validity, because it was found under the direction of the court, assuming that the sum of fifty dollars was insufficient damages, and in substance directing them to find for a larger sum.

*Wheeler*, for plaintiff.

We are unable, from the case or suggestions in the defendants' brief, to see how the remark of the court to the jury, complained of, could influence them in their finding or in any way prejudice the defendants' rights. The law was distinctly stated in the charge, and without complaint by the defendants, either then or now. The court simply remarked, that under the evidence in this case, they had some hesitation about giving that law, but nevertheless they did give it, and gave it distinctly and unequivocally. The court expressed no opinion upon the testimony, but left it entirely for the consideration and finding of the jury. *Nutting* v. *Herbert*, 37 N. H. 346; *Cook* v. *Brown*, 34 N. H. 460; *Flanders* v. *Hancock*, 27 N. H. 223; *Patterson* v. *Colebrook*, 29 N. H. 94; *McDougal* v. *Shirley*, 18 N. H. 108. The officer was instructed by the court, "to keep the jury together until they had agreed." This instruction being given just before the adjournment for dinner, must have been given in open court, and when the counsel for each side were present, was in their hearing and must have been taken to have been given with their assent and approbation. They cannot excuse themselves, by saying they did not hear it or notice it. Counsel are bound to hear and observe, what takes place during a trial.

In the counsel's affidavit, which is the amendment of the case, it appears that he did intend to assent to the separation of the jury, if done by the authority of the court. The separation was by the authority of the court. It was about to adjourn, and the officer was told "to keep the jury together until they had agreed," which implies if they agree before the court convenes, let them separate, otherwise the language is without force and senseless. But in the

separation of the jury, or the action of the court, in again sending them out, there can be no suspicion of abuse, or of injustice to the defendants. *Nims* v. *Bigelow*, 44 N. H. 376, and authorities there cited. *State* v. *Prescott*, 7 N. H. 278, and authorities.

BELLOWS, C. J. The instructions to the jury, were sufficiently favorable to the defendants, and they could not have been misunderstood. The statement of his hesitation about the law, and his reference to a fact which does not appear to have been in dispute, could not have misled them. The law, was very distinctly stated, and after saying, that the court had some hesitation about it, it was repeated in terms that could not fail to be understood. It is not unusual for the judge to let the jury understand, that there may be some doubt about the correctness of some point of the instructions, but that if erroneous there will be an opportunity to correct it, but that they are to take the law to be as then delivered to them—and to this, we can see no objection ; even if the judge, in his discretion, thinks proper to state the reasons for the doubt.

The defendants' counsel urges, that this was no case for exemplary damages. It appears, however, that the controversy was whether the plaintiff was to have the two years old steers or the yearlings. The jury have found, that he was to have the two years old steers, and they might have found this so clearly proved, and the claim of the defendants so unfounded as to indicate bad faith, and give a wilful and malicious character to the acts complained of. If the defendants did not in good faith understand that the bargain was for the yearling steers, but wilfully or wantonly undertook to force them upon the plaintiff they would be liable to exemplary damages, and if they had desired fuller instructions on that point, they should have asked for them. No objections however, appear to have been made to the instructions on that point, and we do not perceive any ground for exception.

The verdict of the jury as first returned, was somewhat ambiguous, and in view of the instructions, that the jury might, if they found the defendants' acts to be wanton, in addition to vindictive damages, find the full value of the oxen, there was reason to suppose they had not stated explicitly what they intended to find, and we think it was perfectly proper, to send them out again, with the instructions which were given.

Such a course, is well warranted by the long settled practice of the court, and the express authority of *Nims* v. *Bigelow*, 44 N. H. 376, and *Clough* v. *Clough*, 26 N. H. 24 ; *Chapman* v. *Coffin*, 14 Gray 454.

Had there been any abuse practiced during the separation of the jury, a different question would have arisen, but none is shown or suggested, and as it is the duty of jurors to avoid all communication out of court about the case, until their final verdict is returned and they are discharged, no abuse will be presumed.

The case of *Nims* v. *Bigelow*, was much stronger than this, for

there the jury had separated after they had returned a verdict. We have no doubt then, that it was within the discretion of the judge, to send the jury out again as he did.

The remaining question, is whether the verdict ought to be disturbed, because of the separation of the jurors, after having agreed upon their verdict and sealed it up.

It does not appear, that the parties had agreed, that they might so separate, nor is it stated in the case, that the court so instructed the officer. It does appear however, that the officer understood, that he was directed by the court, to allow them to separate after they had agreed, which was after the adjournment for dinner and the verdict was returned by the jury sealed, on the coming in of the court in the afternoon. There is no appearance or a suggestion of any abuse beyond the mere fact of separation.

The separation here, seems to have been under a misapprehension and without any wrongful intent on the part of the officer or the jurors, and we think the verdict should not be disturbed on account of it, unless there were some suspicion of abuse. On the case presented, there is not the slightest reason to suppose, that the defendant was injured by the separation in any way.

It is now a very general, and indeed the universal practice, in this state, to allow the jurors to separate in civil cases, after agreeing upon their verdict, and sealing it up ; and had it been suggested before the jury retired, would doubtless have been assented to by the counsel, and directed by the court.

The practice is very convenient for the court and a great relief to the jurors, and after an experience of many years, it has not been found, that it has been attended with injury to suitors ; therefore an injury to the defendant from the separation in this case, would not be presumed without some proof. The case of *Horton* v. *Horton,* 2 Cow. 589, is a direct authority to the point, that a separation of the jury after they had agreed upon a verdict, is no cause for a new trial ; although the court remarked, that if there had been the slightest suspicion of abuse to the injury of the party, the verdict would have been set aside. The same doctrine was recognized in *Smith* v. *Thompson,* 1 Cow. 221, where two of the jurors left the jury room after they had retired to consider of their verdict, and were gone all night. See note to that case, where the cases are collected. The doctrine was also recognized in *Oliver* v. *Trustees,* 6 Cow. 283. These cases are cited by Parker, J. in *State* v. *Prescott,* 7 N. H. 291, and also the *King* v. *Kennear & al.,* 2 Barn. & Ald. 462.

In *The People* v. *Ransom,* 7 Wend. 417, the cases are reviewed, and the result stated, to be this : that " any mere informality or mistake of an officer in drawing a jury, or any irregularity or misconduct in the jurors themselves, will not be a sufficient ground for setting aside a verdict, either in a criminal or civil case, when the court are satisfied, that the party complaining has not, or could not have sustained any injury from it."

This position is concurred in by the court, in *State* v. *Prescott*, before cited, with the qualification, that in a criminal case it should be presumed, that the respondent against whom a verdict was rendered *was* injured by an improper separation of the jury, unless the contrary was shown beyond a reasonable doubt: See also *Nims* v. *Bigelow*, 44 N. H. 376, and cases cited; *People* v. *Douglass*, 4 Cow. 26, where it was laid down by Savage, C. J., to be perfectly clear that in a civil suit, a separation of the jury without, and even contrary to the direction of the court would not of itself warrant the setting aside their verdict. The ancient strictness in this respect, having been much relaxed by the uniform current of modern decisions: See also, Co. Litt. 227 b.

There must, therefore, be

*Judgment on the verdict.*